(text box: 1) 
NO. 5-01-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

______________________________________________________________________________

LYNN FELTMEIER, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Jefferson County.  

)

v. ) No. 99-L-45

)

ROBERT FELTMEIER, ) Honorable

) George W. Timberlake, 

Defendant-Appellant. ) Judge, presiding.  

______________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

It took the law a long time to recognize domestic violence for what it is.
(footnote: 1)  In 1986, our legislature awoke to the reality that "the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability."  750 ILCS 60/102(3) (West 2000).

The Illinois Domestic Violence Act of 1986 (the Act) (750 ILCS 60/101 
et seq.
 (West 2000)) created the crime of domestic battery and provides serious penalties for those who committed it.  While the Act provides a number of remedies in an effort to protect abused spouses and family members, it did not create a civil cause of action to remedy the damages done.  This case addresses the question of whether a victim of domestic violence can maintain a civil action to recover monetary damages for a pattern of marital abuse, inflicted over a number of years and resulting in severe emotional distress.

  The plaintiff wants to recover damages from her former husband for the way he treated her during the course of their 11-year failed marriage.  The complaint alleges a pattern of physical and mental abuse, along with the allegation that it inflicted severe and lasting emotional distress.  We are asked to decide whether a former wife can maintain such an action against her erstwhile husband and, if so, whether an alleged pattern of domestic abuse constitutes one continuous tort, so that the statute of limitations begins to run only after the final abusive act has occurred.

As a rule of thumb, we rarely review questions that arise during litigation's course.  However, if an interlocutory appeal can resolve novel legal questions and thereby facilitate judicial economy, we sometimes accept the review of questions certified for our consideration prior to a final adjudication in the trial court.  155 Ill. 2d R. 308(a).  In this case, we have accepted three issues certified for review by the trial judge.  Their resolution leads us to conclude that this plaintiff can maintain an action at law to recover monetary damages proximately caused by her ex-husband's pattern of abusive treatment during the course of their ill-fated marriage. 

Lynn Feltmeier and Robert Feltmeier entered the bonds of matrimony on October 11, 1986.  The ensuing marriage failed to measure up to the sacred vows under which it was entered.  Lynn was awarded a divorce from Robert on December 16, 1997.  She prevailed on grounds of mental cruelty.  The judgment incorporated the terms of a December 10, 1997, marital settlement agreement, which contained a provision that called for the mutual release of all future claims that either party might have against the other.  

On August 25, 1999, Lynn sued Robert for the intentional infliction of emotional distress.  According to the allegations contained in the complaint, Robert engaged in a pattern of domestic abuse–both physical and mental in nature–that began shortly after the exchange of the marital vows, continued throughout the marriage, and did not cease even after the marriage ended.  Lynn's complaint was very specific about the details and time frames of the alleged physical and emotional abuse.  Lynn alleged that she was physically beaten at least 11 times.  She claimed that many of the beatings were administered while her children were at hand to witness them.  Lynn further alleged that she was physically restrained against her will on more than one occasion.  In addition to the physical abuse, Lynn repeatedly found herself on the receiving end of verbal attacks and flying objects hurled in her direction.  She alleged that her husband systematically isolated her from family and friends.  Finally, she alleged that when she took action to rid herself of the abuse, Robert stalked her.  The complaint specifically alleged more than 45 episodes of abusive behavior.

On October 20, 1999, Robert filed a motion to dismiss the lawsuit.  Robert maintained that the complaint failed to allege facts that give rise to an action for the intentional infliction of emotional distress.  He argued that the conduct alleged was neither extreme nor outrageous in nature.  He also argued that even if the conduct alleged was actionable, the claim was still not viable because the statute of limitations had run on most of the alleged misconduct.

On February 14, 2000, the trial judge denied Robert's motion.  Immediately thereafter, Robert filed an amended motion to dismiss that raised the marital settlement agreement as a release from the various claims presented by Lynn's lawsuit.  The trial judge denied that motion on June 23, 2000.

On April 10, 2001, using the language of Supreme Court Rule 308(a) (155 Ill. 2d R. 308(a)) the trial judge found that the interlocutory orders denying Robert's motions to dismiss involved questions of law "as to which there is substantial ground for difference of opinion" and that an immediate appeal from the orders "may materially advance the ultimate termination of the litigation." 

The issues certified for review are as follows:

1. Whether the plaintiff's complaint states a cause of action for the intentional infliction of emotional distress.

2. Whether the plaintiff's claims for the intentional infliction of emotional distress based on conduct prior to August 25, 1997, are barred by the applicable statute of limitations.

3. Whether the plaintiff's claim against the defendant for the intentional infliction of emotional distress has been released by the language of the marital settlement agreement.

We will address each issue in the order presented.  Additionally, we address an immunity issue raised by Robert in this appeal.

STATING A CAUSE OF ACTION

When a trial judge is presented with a motion to dismiss a case for the failure to state a cause of action pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1998)), he or she must determine whether the complaint sets forth sufficient facts that, if established, could entitle the plaintiff to relief.  
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 86, 672 N.E.2d 1207, 1214 (1996).  The judge must accept all well-pleaded facts in the complaint as true and draw reasonable inferences from those facts that are favorable to the plaintiff.  
Bryson
, 174 Ill. 2d at 86, 672 N.E.2d at 1213.  Because the judge is not being called upon to weigh any witness's credibility or weigh facts, on appeal we review the matter 
de novo
.  
Jackson v. Michael Reese Hospital & Medical Center
, 294 Ill. App. 3d 1, 9, 689 N.E.2d 205, 211 (1997).  The same standard of review applies when determining the propriety of an order denying a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 1998)).  
Dunn v. Patton
, 307 Ill. App. 3d 375, 379, 718 N.E.2d 264, 268 (1999).

To state a valid cause of action for the intentional infliction of emotional distress, the plaintiff must plead certain facts.  To maintain her action, Lynn had to initially allege that Robert engaged in conduct that was truly extreme and outrageous.  She had to further allege that Robert intended to inflict severe emotional distress or knew that there was a high probability that his actions would cause severe emotional distress.  Finally, Lynn had to allege that as a result of Robert's conduct, she actually suffered severe emotional distress.  
McGrath v. Fahey
, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988).  These elements are taken from section 46 of the Restatement (Second) of Torts.  
McGrath
, 126 Ill. 2d at 86, 533 N.E.2d at 809; Restatement (Second) of Torts §46 (1965).  The court system only intervenes in such matters when " 'the distress inflicted is so severe that no reasonable [person] could be expected to endure it.' "  
McGrath
, 126 Ill. 2d at 86, 533 N.E.2d at 809 (quoting Restatement (Second) of Torts §46, Comment 
j
, at 77 (1965)).  

Robert asks us to evaluate Lynn's claim in light of the marital context in which it arose.  He draws upon several cases from other jurisdictions that have rejected efforts to maintain actions for the intentional infliction of emotional distress based upon marital misconduct.  See 
Pickering v. Pickering
, 434 N.W.2d 758, 761 (S.D. 1989) (The husband could not maintain an action for the intentional infliction of emotional distress based upon his wife's extramarital affair.  Such an action does not lie, as a matter of public policy, when it is predicated upon conduct that leads to a divorce.); see also 
Hakkila v. Hakkila
, 812 P.2d 1320 (N.M. App. 1991).  We recognize that the family relationship is an important consideration in analyzing intrafamily torts.

In order to fully appreciate the importance of the marital context to a cause of action for the intentional infliction of emotional distress, we must generally review some of the policy considerations that underlie restrictions of the tort's scope.  Liability does not flow from every act that intends to cause, and does cause, emotional distress.  It is reserved for those who engage in "extreme and outrageous" conduct intended to cause such distress.  

There are several simple reasons to support this limitation on the cause of action.  The law simply cannot impose a degree of civility beyond human capacity.  Courts cannot police every intentional infliction of emotional distress in a society where, like it or not, incivility is quite pervasive.  Nor should they.  As one noted scholar has observed, "[I]t would be unfortunate if the law closed all the safety valves through which irascible tempers might legally blow off steam."  C. Magruder, 
Mental and Emotional Disturbance in the Law of Torts
, 49 Harv. L. Rev. 1033, 1053 (1936).  Most everyone needs some leeway to vent emotions in order to preserve proper mental health.

Making another person unhappy or upset may actually serve a useful purpose, other than simply maintaining a degree of mental health.  Hence, witnesses at a trial have to suffer the anguish of  harsh, and sometimes humiliating, cross-examination, just like young soldiers must suffer the distress that flows from a drill sergeant's wrath during basic training.  

Basic liberty interests serve to justify the limitation of the tort's scope.  "There is still, in this country, such a thing as liberty to express an unflattering opinion of another, however wounding it may be to his feelings ***."  W. Prosser, 
Insult and Outrage
, 44 Cal. L. Rev. 40, 44 (1956).  Similarly, an interest in personal autonomy has led courts to reject lawsuits where a person intentionally causes emotional distress by engaging in an extramarital affair.  
Pickering
, 434 N.W.2d at 761.

Finally, the restriction of this tort to extreme and outrageous behavior provides protection against unfounded and frivolous lawsuits, offering reliable confirmation of injury and causation, the other two elements of the tort.  When conduct is truly extreme and outrageous, it is more likely that severe emotional distress suffered by the victim was actually caused by that conduct.  

These considerations, limiting the liability for the intentional infliction of emotional distress to only outrageous behavior, caution a very limited scope for the tort in the marital context.

We agree with the analysis set forth by Judge Hartz of the New Mexico Court of Appeals:

"Conduct intentionally or recklessly causing emotional distress to one's spouse is prevalent in our society.  This is unfortunate but perhaps not surprising, given the length and intensity of the marital relationship.  Yet even when the conduct of feuding spouses is not particularly unusual, high emotions can readily cause an offended spouse to view the other's misconduct as 'extreme and outrageous.'  Thus, if the tort of outrage is construed loosely or broadly, claims of outrage may be tacked on in typical marital disputes, taxing judicial resources.

In addition, a spouse's most distressing conduct is likely to be privileged.  Partners who are pledged to live together for a lifetime have a right to criticize each other's behavior. [Citation.]  Even though one may question the utility of such comments, spouses are also free to express negative opinions of one another.  'You look awful' or even 'I don't love you' can be very wounding, but these statements cannot justify liability."  
Hakkila
, 812 P.2d at 1324-25 (citing Restatement (Second) of Torts §46, Illustration 13, at 76 (1965) ("she looks like a hippopotamus")).

Judge Hartz also stated the following:

"Moreover, largely because so much interspousal communication is privileged (not in the evidentiary sense, but in the sense that it cannot be the basis for liability), a reliable determination of causation is difficult if not impossible when outrage is alleged in this context.  The connection between the outrageousness of the conduct of one spouse and the severe emotional distress of the other will likely be obscure.  Although the victim spouse may well be suffering severe emotional distress, was it caused by the outrageousness of the conduct or by the implied (and privileged) message of antipathy?  What could be more devastating to one's spouse than to say, 'I don't love you any more'–a statement that could not form the basis for a cause of action?  Rejection alone can create severe emotional distress.  Suicides by jilted lovers are legion.  Every adult knows individuals who have sunk into disabling depression when a spouse seeks divorce.  As a result, litigation of an interspousal claim of outrage could easily degenerate into a battle of self-proclaimed experts performing psychological autopsies to 'discover' whether the cause of the emotional distress was some particular despicable conduct or simply rejection by a loved one.  Of course, no such problem arises in the context of previously recognized intramarital torts.  If one spouse commits a battery on another or causes an accident by driving negligently, the injuries to the other spouse can readily be tied to the tortious conduct. 

* * *

Consequently, in determining when the tort of outrage should be recognized in the marital setting, the threshold of outrageousness should be set high enough–or the circumstances in which the tort is recognized should be described precisely enough, 
e.g.
, child snatching [citation]–that the social good from recognizing the tort will not be outweighed by unseemly and invasive litigation of meritless claims."  
Hakkila
, 812 P.2d at 1325-26.

Mindful that this kind of tort deserves circumscription in the marital setting, we nonetheless find that Lynn's complaint states a proper cause of action for the intentional infliction of emotional distress.  We reject the contention that the complaint fails to meet the law's desire for careful detail in alleging this kind of tort.  See 
McCaskill v. Barr
, 92 Ill. App. 3d 157, 158-59, 414 N.E.2d 1327, 1328 (1980).  The complaint sets forth the alleged pattern of marital misconduct in great detail.  We also disagree with the contention that the complaint falls short of adequately alleging the existence of severe emotional distress.  Lynn specifically alleges that she suffered severe emotional distress, including a loss of self-esteem.  She translates that distress into ongoing symptoms through numerous allegations about its effects on her mental state.  She alleges that she has been diagnosed as suffering from posttraumatic stress disorder, manifested by depression and fear of other men and her inability to form relationships with them.  She alleges that her mental distress has resulted in medical and psychological expenses, which she will continue to incur into the unforeseeable future.

  Given the alleged pattern of abuse, it is reasonable to infer that Robert knew or should have known that his conduct would have long-lasting ramifications.  Robert does not argue a contrary position.  However, he does take issue with the allegation that his conduct amounted to extreme and outrageous behavior.

Robert argues that any objectively reasonable woman could have endured the abuse that he is alleged to have administered, without suffering severe emotional distress.  He maintains that his alleged misconduct, having taken place in the context of an 11-year marriage, was neither extreme nor outrageous.  At oral argument, in an effort to minimize the abusive conduct that Lynn alleged and in order to demonstrate that it was not extreme, Robert's attorney looked at the number of alleged acts and argued that the abuse claimed occurred only three or four times per year over the course of the marriage.  The argument suggested that one beating a year, coupled with an act of physical restraint or an annual pelting from flying missiles, when spread out over an 11-year span, constituted marital conduct that any reasonable wife should be able to endure without suffering emotional distress.   

We cannot accept this position.  As previously noted, we understand that married couples will get into arguments and that, on occasion, those arguments will become heated.  Spouses will most assuredly bruise each other's feelings.  And, from time to time, a husband will touch his wife with an angry hand.  However, the marital conduct alleged in this particular case is different.  It cannot be trivialized below the threshold of outrageousness that is actionable, by calculating the annual number of abusive events and arguing that there were not enough of them per year to matter.  

The allegations of Lynn's complaint typify the kind of abusive relationship that spawns a series of posttraumatic stress symptoms coined the "battered wife syndrome."  This syndrome results from domestic violence and abuse that recurs but is not necessarily constant or all that frequent.  It routinely occurs between relatively long periods of normal and routine family life.  This accounts, in part, for why its victims tend to hold steadfast to the hope that the most immediate abusive episode will be the last of its kind.  They cling to the love and affection the abuser is eager to provide after his attacks, and they resist the need for any assistance as the abusive pattern develops.  Most cries for help are heard only after the psychological, and in some cases physical, damage is irreversible.  Even though the abusive events may only occur a handful of times over the course of a year, the repeated pattern of abuse inflicts daily psychic torment.  Its victims live in a constant state of silent fear, generated by the knowledge that their spouse, the very person with whom they sleep every night, harbors the capacity to hurt them.  While the abusive episodes may not significantly increase in number, they do tend to increase in terms of the harm inflicted.  The victims begin to realize that the abuse is certain to come again, but they are unable to predict its appointed hour.  They also begin to fear the intensity of the next episode.  

Domestic violence and domestic abuse can take many forms.  The kind alleged here is extreme enough to be actionable.  It combines more than a decade of verbal insults and humiliations with episodes where freedom of movement was deprived and where physical injury was often inflicted.  The alleged pattern of abuse, combined with its duration, worked a humiliation and loss of self-esteem.  Regardless of the form in which it arrived, violence was certain to erupt, and when seasons of spousal abuse turn to years that span the course of a decade, we are unwilling to dismiss it on grounds that it is unworthy of outrage. 

We find that the complaint clearly articulates a pattern of conduct that satisfies the  standard necessary to state a cause of action for the intentional infliction of emotional distress.  We have not been directed to, nor could we independently find, any Illinois case holding that marital domestic abuse can be sufficiently outrageous to sustain a tortious cause of action.  Lynn's attorneys cite an Idaho case, upon which the trial court partially relied.  In 
Curtis v. Firth
, 850 P.2d 749 (Idaho 1993), the parties were not married but had cohabitated for more than 10 years.  
Curtis
, 850 P.2d at 751.  When the 10-year relationship ended, Ms. Curtis filed her claim against Mr. Firth for the intentional infliction of emotional distress based upon a recurrent pattern of domestic violence–both verbal and physical.  
Curtis
, 850 P.2d at 751-52.  The allegations related back to the period of cohabitation.  
Curtis
, 850 P.2d at 751-52.  Based upon the same elements necessary to plead and prove a case of the intentional infliction of emotional distress in Illinois, the Idaho Supreme Court concluded that the defendant's behavior was outrageous.  
Curtis
, 850 P.2d at 757.  While some of the evidence, if considered in isolation, could be viewed as nothing more than the trials of cohabitation, the trial court determined that there was extensive testimony about the mental and physical abuse inflicted and that the quality of this testimony was sufficient to establish the outrageousness of the conduct.  
Curtis
, 850 P.2d at 757. 

Illinois has determined that domestic violence presents sufficient problems to warrant its own legislative act to deal with the violence.  By enacting these statutes, our legislature is saying that such behavior is unacceptable, and from that finding it can be inferred that violent behavior in the domestic setting is outrageous.  Our supreme court has found that the duration of the behavior at issue is one factor to consider in determining whether that behavior is outrageous.  
McGrath
, 126 Ill. 2d at 86, 533 N.E.2d at 809.  A pattern, course, and accumulation of acts can make an individual's conduct "sufficiently extreme to be actionable, whereas one instance of such behavior might not be."  
Pavlik v. Kornhaber
, 326 Ill. App. 3d 731, 746, 761 N.E.2d 175, 187 (2001).  This duration factor is not new law.  Its foundation lies in section 46 of the Restatement (Second) of Torts.  See Restatement (Second) of Torts §46, Comment 
j
, at 77-78 (1965).  The duration of Robert's alleged abusive behavior helps to support the outrageous nature of the conduct alleged in the complaint.  We conclude that Lynn has alleged facts which, if proven, could entitle her to relief.  The trial court's order to that effect was correct.

STATUTE OF LIMITATIONS

Robert contends that each separate act of abuse triggered a new statute of limitations so that all acts of abuse which occurred more than two years prior to the date on which Lynn filed her complaint would be barred. 

Given the type of psychological damage Lynn experienced, she asks this court to adopt the continuing-tort theory in the context of domestic violence and abuse.  The applicable statute of limitations for a cause of action alleging the intentional infliction of emotional distress is two years, because the tort is a form of personal injury.  735 ILCS 5/13-202 (West 1998).  The purpose of the statute of limitations is to discourage old claims.  
Pavlik
, 326 Ill. App. 3d at 744-45, 761 N.E.2d at 186.  The continuing-tort theory advanced by Lynn looks at the behavior of the defendant as a continuous whole.  If the theory is applied, the statute of limitations would not start until either the continuing behavior at issue stopped or the last such act occurred.  
Hyon Waste Management Services, Inc. v. City of Chicago
, 214 Ill. App. 3d 757, 763, 574 N.E.2d 129, 132-33 (1991).

In Illinois, the continuing-tort theory has traditionally been applied in various nuisance and trespass-type situations.  See, 
e.g.
, 
City of Rock Falls v. Chicago Title & Trust Co.
, 13 Ill. App. 3d 359, 364, 300 N.E.2d 331, 334 (1973) (tortious interference with the owner's utilization of property); 
Leckrone v. City of Salem
, 152 Ill. App. 3d 126, 137-38, 503 N.E.2d 1093, 1101 (1987) (nuisance).   In 1993, this court extended the doctrine to a case involving improperly cashed checks.  
Field v. First National Bank of Harrisburg
, 249 Ill. App. 3d 822, 826, 619 N.E.2d 1296, 1299 (1993).  Over a four-year period, a son deposited checks made payable to his father into accounts not bearing the father's name.  
Field
, 249 Ill. App. 3d at 826, 619 N.E.2d at 1299.  Finding guidance in the trespass and nuisance cases, we concluded that the numerous acts of check-cashing constituted an ongoing scheme amounting to one transaction, so that the statute of limitations did not begin to run until the date on which the last check was cashed by the son.  
Field
, 249 Ill. App. 3d at 825-26, 619 N.E.2d at 1299.

Also in 1993, the Illinois Supreme Court extended the doctrine into the medical malpractice arena, in 
Cunningham v. Huffman
, 154 Ill. 2d 398, 609 N.E.2d 321 (1993).  The court was called upon to interpret section 13-212 of the Code of Civil Procedure, which provided that the outside statute of limitations for medical malpractice could be no more than four years " 'after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death.' "  
Cunningham
, 154 Ill. 2d at 401, 609 N.E.2d at 323 (quoting Ill. Rev. Stat. 1989, ch. 110, par. 13-212(a)).  While the court felt that this statutory language was sufficiently clear so that it could not adopt the continuous-course-of-treatment doctrine to extend the statute of limitations in the medical malpractice context, the court found that the statute could accommodate the plaintiff's cause of action by construing the word "occurrence" to include "continuing negligent course of treatment for a specific condition."  (Emphasis omitted.)  
Cunningham
, 154 Ill. 2d at 404-05, 609 N.E.2d at 324.  The supreme court provided other guidance on the application of the continuing-tort theory in a medical malpractice case.  If a plaintiff can show that his or her negligent treatment was a part of a continuous and unbroken course and that the treatment was sufficiently related so that it constituted one wrong, then the statute of limitations will not apply.  
Cunningham
, 154 Ill. 2d at 406, 609 N.E.2d at 325.  Stated otherwise, the statute of limitations does not begin to run until the last day of the negligent treatment.  
Cunningham
, 154 Ill. 2d at 406, 609 N.E.2d at 325.

Two appellate court cases filed in late 2001 additionally expanded upon the doctrine's application.  

In 
McGee v. Snyder
, 326 Ill. App. 3d 343, 352-53, 760 N.E.2d 982, 990-91 (2001), the Second District Appellate Court determined that in a civil rights setting, the denial of good-conduct credits was a continuing tort and that the statute of limitations was tolled.  In 
Pavlik
, 326 Ill. App. 3d at 745-46, 761 N.E.2d at 187-88, the First District Appellate Court concluded that, given a certain set of facts, the intentional infliction of emotional distress can be a continuing tort, affording the injured party more time in which to file his or her suit.

Because 
Pavlik
 involved the intentional infliction of emotional distress, we will discuss it in more depth.  Jennifer Pavlik had a master's degree in social work and in June 1994 became employed by Community Counseling Associates (CCA) as a therapist.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  To be employed as a therapist, CCA required its therapists to undergo counseling with one of the other employees.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  CCA also required its new therapists to be professionally supervised.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  Bruce Kornhaber was a principal with and a staff member of CCA.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  He was assigned to work with Jennifer Pavlik, both as her supervisor and as her counselor.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  During the course of this one-on-one relationship, Jennifer Pavlik alleged that Bruce Kornhaber sexually harassed her.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179-80.

On November 1, 1996, she filed suit against Bruce Kornhaber and CCA.  She sought monetary damages for the psychological and other harm she suffered as a result of the harassment.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  In her complaint, Jennifer Pavlik contended that the harassment began with her June 1994 employment and continued until the day she quit her job on November 1, 1994.  
Pavlik
, 326 Ill. App. 3d at 736, 761 N.E.2d at 180.  However, when called upon to respond to a bill of particulars, Jennifer Pavlik acknowledged that her formal clinical supervision and psychotherapeutic counseling began on July 27, 1994, and continued through October 17, 1994.  
Pavlik
, 326 Ill. App. 3d at 736, 761 N.E.2d at 180.  The complaint at issue was in nine counts.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  The five counts against Bruce Kornhaber were for negligence, nuisance, fraud, breach of fiduciary duty, and intentional infliction of emotional distress.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  The four counts against CCA were for 
respondeat superior
, direct corporate negligence, direct nuisance, and direct intentional infliction of emotional distress.  
Pavlik
, 326 Ill. App. 3d at 735, 761 N.E.2d at 179.  Her complaint was supported with documentation–notes, memos, 
etc.
–written by Bruce Kornhaber to Jennifer Pavlik, including a November 4, 1994, letter he wrote to her regarding her abrupt departure from CCA.  
Pavlik
, 326 Ill. App. 3d at 736, 761 N.E.2d at 179-80.  In this letter, Bruce Kornhaber acknowledged that, at least in part, he must have caused her departure.  
Pavlik
, 326 Ill. App. 3d at 736-37, 761 N.E.2d at 180.  He closed the letter with a signature line containing an admission of endearment.  
Pavlik
, 326 Ill. App. 3d at 737, 761 N.E.2d at 180.

The defendants filed motions to dismiss Jennifer Pavlik's complaint pursuant to section 2-619 of the Code of Civil Procedure, arguing that the statute of limitations had passed on all allegations contained within the complaint.  
Pavlik
, 326 Ill. App. 3d at 737, 761 N.E.2d at 181.  The trial court granted this motion.  
Pavlik
, 326 Ill. App. 3d at 737, 761 N.E.2d at 181.

Jennifer Pavlik advanced a continuing-tort theory.  
Pavlik
, 326 Ill. App. 3d at 738, 761 N.E.2d at 181-82.  She argued that the therapeutic relationship at issue extended beyond the formal office "session" context and included certain informal interactions between the parties.  
Pavlik
, 326 Ill. App. 3d at 739, 761 N.E.2d at 182.  This doctrine was applied in a medical malpractice context to avoid the harsh results that can occur when a statute of limitations is strictly enforced.  
Pavlik
, 326 Ill. App. 3d at 739, 761 N.E.2d at 182 (citing 
Cunningham
, 154 Ill. 2d at 406, 609 N.E.2d at 325). 

The court of appeals in 
Pavlik
 concluded that Jennifer Pavlik failed to establish that the treatment at issue (the November 4, 1994, letter from Bruce Kornhaber) constituted a treatment justifying the extension of the statute of repose for negligence or medical malpractice claims.  
Pavlik
, 326 Ill. App. 3d at 740, 742, 761 N.E.2d at 183, 185.

Jennifer Pavlik also alleged that she suffered extreme emotional distress as a result of Bruce Kornhaber's repeated offensive sexual advances.  
Pavlik
, 326 Ill. App. 3d at 743, 761 N.E.2d at 185-86.  The appellate court quickly concluded that the allegations were sufficiently offensive to support her claim, and it turned to the statute-of-limitations issue.  
Pavlik
, 326 Ill. App. 3d at 744, 761 N.E.2d at 186.  Citing the general rule that a cause of action accrues when the interest at issue is invaded, the court stated, "[W]here a tort involves continuing or repeated injurious behavior, 'the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease.' "  
Pavlik
, 326 Ill. App. 3d at 745, 761 N.E.2d at 186-87 (quoting 
Hyon Waste Management Services, Inc.
, 214 Ill. App. 3d at 763, 574 N.E.2d at 132).  Applying the law as stated in 
Hyon Waste Management Services, Inc.
, the court concluded that Jennifer Pavlik had sufficiently alleged a continuing series of  tortious acts which tolled the statute of limitations.  
Pavlik
, 326 Ill. App. 3d at 745, 761 N.E.2d at 187.   In determining that the limitations period began running in early November 1994, the dates of the final contacts Bruce Kornhaber had with Jennifer Pavlik, 
the court stated, "Because it is impossible to pinpoint the specific moment when enough conduct has occurred to become actionable, the termination of the conduct provides the most sensible place to begin the running of the prescriptive period."  
Pavlik
, 326 Ill. App. 3d at 746, 761 N.E.2d at 187-88.

We agree with the decision of the First District Appellate Court in 
Pavlik
 in applying the continuing-tort theory to claims for the intentional infliction of emotional distress.  

We are also in agreement with other states that have recognized the continuing-tort theory in the context of domestic abuse cases.  See, 
e.g.
, 
Curtis v. Firth
, 850 P.2d 749 (Idaho 1993); 
Cusseaux v. Pickett
, 652 A.2d 789, 794 (N.J. App. 1994). 

The alleged domestic violence and abuse endured by Lynn in this case spanned the entire 11-year marriage.  No one disputes that the allegations set forth the existence of ongoing abusive behavior.  Lynn's psychologist, Dr. Michael E. Althoff, found that Lynn suffered from the "battered wife syndrome."  He described the psychological process as one that unfolds over time.  The process by which a spouse exerts coercive control is based upon "a systematic, repetitive infliction of psychological trauma" designed to "instill terror and helplessness."  Dr. Althoff indicated that the posttraumatic stress disorder from which Lynn suffered was the result of the entire series of abusive acts, not just the result of one specific incident.

"The mate who is responsible for creating the condition suffered by the battered victim must be made to account for his actions–
all
 his actions.  Failure to allow affirmative recovery under these circumstances would be tantamount to the courts condoning the continued abusive treatment of women in the domestic sphere."  (Emphasis in original.)  
Cusseaux
, 652 A.2d at 794.  We find that the statute of limitations did not begin to run until the date of the last injury Lynn suffered or when Robert's tortious acts ceased to occur.  The complaint includes allegations relative to Robert's behavior through August 1999.  Accordingly, Lynn's complaint was timely filed, and the trial court's orders denying Robert's motions to dismiss were correct.  

RELEASE OF CLAIMS BY MARITAL SETTLEMENT AGREEMENT

Robert contends that there are two clauses in the marital settlement agreement, executed by the parties on December 11, 1997, that operate to release the claim brought by Lynn in this suit.  Before addressing the merits of this argument, we look to the specific language at issue.  Paragraph 8(a) of the agreement is as follows:

"To the fullest extent by law permitted to do so, and except as herein otherwise provided, each of the parties does hereby forever relinquish, release, waive, and forever quitclaim and grant to the other, his or her heirs, personal representatives[,] and assignees[] all rights of dower, inheritance, descent, distribution, community interest, marital property, and all other right, title, claim, tort claims, interest, and estate as husband and wife, widow or widower, or otherwise, by reason of the marital relations existing between the parties hereto, under any present or future law, or which he or she otherwise has or might have or be entitled to claim in, to, or against the property and assets of the other, real, personal, or mixed, or his or her estate, whether now owned or hereafter in any manner acquired by the other party, or whether in possession or in expectancy, whether vested or contingent, and each party further covenants and agrees for himself or herself, his or her heirs, personal representatives[,] and assignees[] that neither of them will at any time hereafter sue the other or his or her heirs, personal representatives, grantees, devisees[,] or assignees, for the purpose of enforcing any of the rights specified in and relinquished under this paragraph 8(a), and further agrees that in the event any suit shall be commenced, this release, when pleaded, shall be and constitute a complete defense to any claim or suit so instituted by either party hereto, and [each party] further agrees to execute, acknowledge[,] and deliver at the request of the other party[] or his or her heirs, personal representatives, grantees, devisees[,] or assignees[] any or all such deeds, releases[,] or other instruments[] and further assurances as may be required or reasonably requested to effect or evidence such release, waiver, relinquishment[,] or extinguishment of such rights; provided, however, that nothing herein contained shall operate or be construed as a waiver or release by either party to the other party of any obligation imposed upon or undertaken by a party under this Agreement."

Paragraph 8(d) provides as follows:

"Save and except as herein otherwise provided, and to the fullest extent that they may lawfully do so, all the rights, claims, and demands of every kind, nature[,] and description[] which each party has, or may hereafter have, or claim to have against the other[] shall be and the same hereby are forever discharged, extinguished, released, and ended, and all matters and charges whatsoever, and any and all manner of actions or causes of actions, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims, and demands whatsoever, in law or in equity, which each party ever had [or] now has[] or which he or she, his or her heirs, executors, administrators, or assignees, or any of them[] hereafter can, shall, or may have against the other (as the case may be) for or by reason of any cause, matter[,] or thing whatsoever, from the beginning of the world to the effective date hereof, shall be and the same are[] extinguished; provided, however, that nothing herein contained shall release or limit the obligation of either of the parties hereto to comply with the other provisions of this Agreement or with any Order of Protection or Restraining Order that may exist in favor of one party against the other."

Robert asks us to conclude that these two provisions release him from liability for the abusive behavior he inflicted upon Lynn during and after their marriage.  Initially, we note that the question can be simply answered in the negative in light of our holding on the continuing-tort theory.  Lynn's cause of action did not arise until, at the earliest, mid-1999.  This agreement was signed a little less than two years before.

A release with very general boilerplate language, such as the two provisions at issue, cannot be construed to release future causes of action between the parties.  Such language would be contrary to public policy.  See 
Chubb v. Amax Coal Co.
, 125 Ill. App. 3d 682, 686, 466 N.E.2d 369, 372-73 (1984).  General release language simply cannot operate to release unknown claims.  
Farm Credit Bank of St. Louis v. Whitlock
, 144 Ill. 2d 440, 447, 581 N.E.2d 664, 667 (1991).  Neither Lynn nor Robert was aware of Lynn's claim when they signed the agreement.  Consequently, this release can only release the specific claims listed.  
Farm Credit Bank of St. Louis
, 144 Ill. 2d at 447, 581 N.E.2d at 667. 

The language of paragraph 8(a) involves claims derived from the marital relationship itself.  Domestic abuse is not one such claim.  The provision is meant to deal with traditional common law marital issues, such as dower.

Turning to the language of paragraph 8(d), we note that it contains catch-all release language.  No type of claim is specifically released.  As already stated, general boilerplate language is simply ineffective to release specific types of claims.  
Deida v. Murphy
, 271 Ill. App. 3d 296, 300, 647 N.E.2d 1109, 1112 (1995).

Consequently, the marital settlement agreement does not bar Lynn's suit against Robert for the intentional infliction of emotional distress that arose after the agreement's execution.  Additionally, the general language of the relevant release provisions is insufficient to bar Lynn's suit.

IMMUNITY FROM SUIT

Robert also contends that he is immune from any and all of Lynn's claims for conduct that occurred prior to January 1, 1988, the date on which spouses were statutorily allowed to sue each other for a tort committed during the marriage (see 750 ILCS 65/1 (West 1998)).  Prior to that date, interspousal suits were only allowed in situations where there was an intentional tort with physical harm.  Ill. Rev. Stat. 1987, ch. 40, par. 1001.  The amendment to the statute only applies prospectively.  
Kim v. Kim
, 196 Ill. App. 3d 1095, 1100, 554 N.E.2d 621, 624 (1990).  On the basis of immunity, Robert argues that Lynn's suit fails to state a cause of action.

We are aware that the trial court did not certify this question to this court.  However, we have elected to respond to the question because the question relates to the appropriateness of the orders that gave rise to this appeal.  See 
Johnson v. State Farm Mutual Automobile Insurance Co.
, 323 Ill. App. 3d 376, 379, 752 N.E.2d 449, 452 (2001) (citing
 In re Lawrence M.
, 172 Ill. 2d 523, 670 N.E.2d 710 (1996)).

Because of our determination that the continuing-tort theory applies to domestic abuse cases in the context of a claim for the intentional infliction of emotional distress and because it is alleged that Lynn's injuries and damages arise from the totality of Robert's abusive acts, Robert's claims of immunity fail.

CONCLUSION

Accordingly, we answer the first certified question in the affirmative and the second and third certified questions in the negative.  We also respond in the negative to the additional immunity issue brought forth by Robert in this appeal.  We remand this cause for further proceedings.  

Certified questions answered; cause remanded.

GOLDENHERSH, J., concurs.

JUSTICE WELCH, concurring in part and dissenting in part:

I concur with the majority that Lynn's complaint satisfies the standard necessary to state a cause of action for the intentional infliction of emotional distress, but I respectfully dissent from the remainder of the majority's opinion.

First, regarding the statue of limitations, Robert contends that each separate act of abuse triggered a new statute of limitations so that all acts of abuse which occurred more than two years prior to the date on which Lynn filed her complaint are barred.  I agree.  Although I am sympathetic to Lynn's alleged plight and I understand that the majority is well-intentioned in applying the 
continuing-tort theory in the context of domestic violence and abuse, I believe that the law dictates otherwise.

The majority correctly states that the applicable statute of limitations for a cause of action alleging the intentional infliction of emotional distress is two years, because the tort is a form of personal injury.  See 735 ILCS 5/13-202 (West 1998).  Specifically, the statute reads, "Actions for damages *** shall be commenced within 2 years next after the cause of action accrued ***."  735 ILCS 5/13-202 (West 1998).

Under the continuing-tort theory, also known as the continuing-violation rule, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.  
Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.
, 199 Ill. 2d 325, 345 (2002).  In 
Cunningham v. Huffman
, our supreme court held that a medical malpractice claim is not barred by the statute of repose where the plaintiff shows that there was a continuous and unbroken course of negligent treatment and that the treatment was so related that it constituted one continuing wrong.  154 Ill. 2d 398, 406 (1993).  The 
Cunningham
 court did not adopt a continuing-violation rule of general applicability in all tort cases.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 347.  Instead, the result in 
Cunningham
 was based on the interpretation of the language of the statute of repose.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 347.

In 
Belleville Toyota, Inc.
, a dealership sued the importer and the wholesaler of new Toyota vehicles, claiming a breach of contract and a violation of the Motor Vehicle Franchise Act (815 ILCS 710/1 
et seq.
 (West 2000)) for failing to allocate vehicles in contractually required quantities and for fraudulently concealing their conduct over a period of many years.  199 Ill. 2d at 329-30.  Our supreme court, focusing on the statutory language of the Motor Vehicle Franchise Act limitations period, concluded that the dealership did not identify any statutory language that would require a result similar to 
Cunningham
.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 347.  Moreover, the 
Belleville Toyota, Inc.
 court did not discern any "unjust result," which it had sought to avoid in 
Cunningham
, that would favor applying a continuing-violation rule.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 347.  The 
Belleville Toyota, Inc,
 court went on to explain that the importer's and wholesaler's repeated, alleged misallocations did not constitute "one, continuing, unbroken, decade-long" statutory violation.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 349.  Instead, each allocation constituted a separate statutory violation–supporting a separate cause of action.  
Belleville Toyota, Inc.
, 199 Ill. 2d at 347.

Here, I simply believe that each alleged act of abuse by Robert resulted in a separate cause of action for the intentional infliction of emotional distress.  Applying the statutory language, I would hold that Lynn's causes of action accrued at the time of the alleged abuse.  Moreover, I cannot discern any unjust result, because Lynn has alleged actionable, noncumulative, tortious conduct within the limitations period.  Therefore, I believe that the circuit court erred by denying Robert's motion to dismiss the allegations of conduct outside the limitations period.

Second, I agree with Robert's contention that paragraph 8(d) of the marital settlement agreement, executed by the parties on December 11, 1997, released the claim brought by Lynn in this suit.  Paragraph 8(d) provides in pertinent part as follows:

"[A]ll the rights, claims, and demands of every kind, nature[,] and description[] which each party has, or may hereafter have, or claim to have against the other[] shall be and the same hereby are forever discharged, extinguished, released, and ended, and *** any and all manner of actions or causes of actions, suits, *** claims, and demands whatsoever, in law or in equity, which each party ever had *** or may have against the other (as the case may be) for or by reason of any cause, matter[,] or thing whatsoever, from the beginning of the world to the effective date hereof, shall be and the same are[] extinguished[.]" 

A question of contract construction is reviewed 
de novo
.  See 
State Farm Mutual Automobile Insurance Co. v. George Hyman Construction Co.
, 306 Ill. App. 3d 874, 882 (1999).  Absent ambiguity, the meaning and intent of a contract must be ascertained by the language utilized in the contract.
  Lenzi v. Morkin
, 103 Ill. 2d 290, 293 (1984).  A contractual release relinquishes a claim, but not future claims or uncontemplated claims.  See 
Carona v. Illinois Central Gulf R.R. Co.
, 203 Ill. App. 3d 947, 951 (1990).

Here, the language of the settlement agreement extinguishes all current and future causes of action between the parties.  Although the waiver of future claims is prohibited as a matter of law as mentioned above, we are not dealing here with a future claim.  Here, Lynn either knew or should have reasonably known of her current claim for emotional distress at the time she executed the marital settlement agreement.  Thus, she elected to release it under the terms of the settlement agreement.

I note that the majority cites 
Deida v. Murphy
 for the proposition that general boilerplate language is simply ineffective to release specific types of claims.  271 Ill. App. 3d 296, 300 (1995).  I point out that in 
Deida
, this court held that specific, unchanged, written beneficiary designations on an annuity contract and on two certificates of deposit were not waived by the general language of a dissolution settlement agreement.  
Deida
, 271 Ill. App. 3d at 297-300.  Here, the majority fails to point to any specific language in the agreement that overcomes the general.  Nevertheless, Lynn argues that the specific provisions in paragraph 8(a) limit the general provisions of paragraph 8(d).  I would give this argument weight if paragraph 8 of the settlement agreement was cohesive.  It is not.  I need only point out that paragraph 8(f) involves social security law and paragraph 8(g) involves applicable governing law.

Therefore, I believe that the marital settlement agreement bars Lynn's suit against Robert for the intentional infliction of emotional distress for incidents arising prior to the agreement's execution. 

Third, the majority has addressed Robert's contention that he is immune from interspousal suit for all of Lynn's claims based on conduct that occurred prior to January 1, 1988, the date on which spouses were statutorily allowed to sue each other for a tort committed during the marriage (750 ILCS 65/1 (West 1998)).  I see no need to reach this issue, based on the analysis that I have set forth today.

Therefore, I decline to address the immunity issue, and I answer the issues certified for review  as follows:

1. Whether the plaintiff's complaint states a cause of action for the intentional infliction of emotional distress.  Yes.

2. Whether the plaintiff's claims for the intentional infliction of emotional distress based on conduct prior to August 25, 1997, are barred by the applicable statute of limitations.  Yes.

3. Whether the plaintiff's claim against the defendant for the intentional infliction of emotional distress has been released by the language of the marital settlement agreement.  Yes, as to those acts alleged to have occurred prior to its execution.

For the foregoing reasons, I concur in part and dissent in part.

NO. 5-01-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________________________

LYNN FELTMEIER, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Jefferson County.  

)

v. ) No. 99-L-45

)

ROBERT FELTMEIER, ) Honorable

) George W. Timberlake, 

Defendant-Appellant. ) Judge, presiding.  

_________________________________________________________________________________

Opinion Filed
: September 18, 2002

_________________________________________________________________________________

Justices
: Honorable Clyde L. Kuehn, J.

Honorable Richard P. Goldenhersh, J., 

Concurs  

Honorable Thomas M. Welch, J., 

Concurs in part and dissents in part

_________________________________________________________________________________

Attorneys
 Donald V. Ferrell, Thomas J. Foster, Jelliffe, Ferrell, Morris, Doerge & 

for
 Foster, 108 East Walnut Street, P.O. Box 406, Harrisburg, IL  62946

Appellant
 

_________________________________________________________________________________

Attorney
 Morris Lane Harvey, Law Offices of Morris Lane Harvey, 2029 Broadway,

for
 Mt. Vernon, IL  62864

Appellee
 

_________________________________________________________________________________

FOOTNOTES
1:
Battered wives were not always looked upon as crime victims.  
An angry husband could whip his wife, provided that he employed the use of a rod no larger than the diameter of his thumb.  Called the "Rule of Thumb," this English common law acknowledged, condoned, and perpetuated the physical abuse of women.  See W. Blackstone, 1 Commentaries on the Law of England, at 445-46 (1765).

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 09/18/02.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.