2025 IL App (2d) 240311
No. 2-24-0311
Opinion filed February 14, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| S.E., J.E., and B.E., | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 23-MR-371 |
| | ) | |
| BMO HARRIS BANK NATIONAL | ) | |
| ASSOCIATION, d/b/a BMO Harris Bank, | ) | |
| N.A., and/or BMO Harris Bank N.A., | ) | |
| Individually and as Personal Representative | ) | |
| of the Estate of William P.E. and as Trustee | ) | |
| of the William P.E. Revocable Trust dated | ) | |
| April 7, 1992, | ) | Honorable |
| | ) | Charles W. Smith, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs, S.E., J.E., and B.E., are the adult children of the late William P.E. This is their interlocutory appeal from the dismissal of count I of their three-count amended complaint (see Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)) against defendant, BMO Harris Bank National Association (BMO). Count I sought recovery for William's alleged intentional infliction of emotional distress on plaintiffs. Plaintiffs contend that the trial court erred in holding that (1) most of count I's allegations were barred by the two-year statute of limitations (see 735 ILCS 5/13-202 (West 2022))

and (2) the allegations not time-barred failed to state a cause of action for intentional infliction of emotional distress. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3                          A. Plaintiffs' Amended Complaint

¶ 4      On August 15, 2023, plaintiffs filed their initial complaint against BMO. On December 28, 2023, they filed their three-count amended complaint. Counts II and III alleged that BMO failed to protect personal property in which plaintiffs claimed interests as William's heirs. Count I alleged, as noted, that William committed intentional infliction of emotional distress against plaintiffs.

¶ 5      Plaintiffs alleged the following as background. They are the daughters of William and C.E., both deceased. BMO is the personal representative of William's estate and the trustee of the William P.E. Revocable Trust dated April 7, 1992 (Trust). S.E. was born on May 22, 1974, and resides in Illinois. J.E., born January 17, 1978, and B.E., born April 21, 1980, reside in Virginia. On August 15, 2021, William died testate.

¶ 6      Count I alleged that William intentionally inflicted emotional distress on plaintiffs for most of their lives until he died. Many of plaintiffs' allegations are mere conclusions, and some are vague as to dates.

¶ 7                              1. Alleged Abuse of S.E.

¶ 8      Count I alleged that, "[t]hroughout [S.E.]'s life," William called her "dumb" if she expressed an opinion different from his. When she was an infant, he rode her on his lap to get an erection, then made her play with it. When S.E. was seven, she spilled water on the floor; William pulled her onto the floor and wiped the spill up with her shirt. When S.E. was 14 or 15, William made her kiss him on the lips. Thereafter, S.E. slept in the same bedroom with her sisters whenever

possible. However, William routinely called for plaintiffs, especially S.E., to join him in bed. Once, when S.E. was in her twenties, she was in her parents' bed when William pushed his erection through C.E.'s legs so that S.E. felt it. On another occasion, when S.E. was in her thirties, the family was on vacation when William ordered her into a motel bathroom so that she could see him naked.

¶ 9                                     2. Alleged Abuse of J.E.

¶ 10    Count I alleged that, in J.E.'s early childhood, William routinely abused her physically, such as by (1) kicking her down the stairs when she was five or six years old and (2) repeatedly beating her, hitting her head against stationary objects, and dragging her around by her hair when she was eight or nine. He also threatened to hurt her sisters or C.E. This abuse caused J.E. tremendous anxiety, for which she was still being treated. Further, when J.E. was 16, after enduring an hour of William's verbal abuse, she went outside and lay in the street, hoping that a car would run her over. C.E. ran outside, and J.E. got up. After C.E. told William what had happened, he came outside, slapped J.E., grabbed her by her hair, dragged her inside, and threw her into her room.

¶ 11                                    3. Alleged Abuse of B.E.

¶ 12    Count I alleged that, once, when B.E. was in her twenties, William had her water his garden. B.E. accidentally splashed water on his pants leg; he made her sit down, then turned on a hose and repeatedly sprayed her until "[she] felt like [she] was being both punched in the chest and waterboarded." William "sabotaged every job [B.E.] tried to interview for" by telling her it did not pay enough. William also molested B.E. and her siblings, such as by kissing them against their will and snuggling with them while he was naked.

¶ 13    William repeatedly punished B.E. brutally for minor lapses. When she was eight or nine, she took a pill and vomited; William made her dig through the vomit to extricate the pill and then swallow it again. When she was 12, he punished her for poor oral hygiene by forcing her to chew a piece of steak and then spit it out; he kept the piece of steak for two days and then forced her to chew it, though by then, it was rotten. When she was 14, she was preparing to perform at a concert but forgot something. William wrapped a bicycle chain around her neck and fastened the chain with a padlock. She rode to the concert with the chain wrapped painfully around her neck.

¶ 14    When B.E. was in her teens and early twenties, William used her as "his personal servant," requiring her to dress him, comb his hair, and wash his socks. He punished her physically for any lapses. If B.E. forgot to take out the garbage, he would dump it in her bed, underneath the covers. If she did not sweep the kitchen perfectly, William would make her pick up the dirt by hand or with her tongue. William made B.E. work with dangerous tools and chemicals but never provided protective gear. He often made her scrape sewage out of a basement hole without gloves. William also forced B.E. to watch him torture animals like squirrels or chipmunks that got into his plants. In spring 2017, when B.E. lived in Virginia, William somehow obtained her number and called her. In a menacing voice, he said, " 'Hello [B.E.],' prolonging the greeting to convey to [her] that she was not safe from [him.]"

¶ 15                              4. Other Alleged Abuse

¶ 16    Count I alleged that William required C.E. to abide by and enable his abuse of plaintiffs. He forced her to pay most of her attention to him and resented any show of affection between her and plaintiffs. William refused plaintiffs any contact with C.E. outside his presence. When they tried to contact C.E. by phone, he either refused the contact or stayed on the line.

¶ 17    In early 2014, J.E. learned that she was pregnant. In September 2014, after learning that the baby had died *in utero*, she called and e-mailed her parents. William did not respond; when C.E. answered J.E.'s call, William ordered her to hang up. From February 2014 to May 2017, B.E. was out of the country and had not told William. When she returned, she secured a new home near J.E. in Virginia and a new phone number; she gave William neither her address nor her phone number.

¶ 18    In 2016, William told his brother-in-law that C.E.'s illnesses caused plaintiffs' estrangement from their parents. His statement was relayed to plaintiffs. Plaintiffs decided they would try to reconcile with William and appointed J.E. to contact him. Four times between 2016 and 2019, J.E. called William. He "dismissed" her attempts to reconcile. He also "taunted" them during that time. In one call to William between 2016 and 2019, J.E. asked him to try family therapy because he had abused plaintiffs. He responded, " 'You were abused?' " He then laughed and hung up the phone. Also, in March 2019, William e-mailed plaintiffs from C.E.'s account, saying: " 'If there are any questions you have about your early years, relatives, or ancestors, you might want to ask us about them now. Realistically, you don't have much time left.' "

¶ 19    In late 2019, when C.E. had a mental illness, she and William visited Washington, D.C. William allowed plaintiffs to meet with C.E. in a hotel lobby for two hours. He then appeared by surprise from an adjoining area. He smirked at plaintiffs, implying that he had eavesdropped on them. In mid-2020, after learning that C.E. was seriously ill, J.E. called William and begged to speak with C.E. William paused, said no, and hung up the phone. In July 2020, C.E. died. William held the funeral before plaintiffs could learn about it or arrange to travel there. Although the funeral occurred during the COVID-19 pandemic, William would not set up a remote link for plaintiffs to observe.

¶ 20    By mid-2021, William was so ill that he required around-the-clock care. When his caregiver asked J.E. for assistance, she agreed and started working with William's care facility. William found out, called her, and told her to "get lost."

¶ 21    On August 7, 2021, knowing that death was near, William amended the Trust, "direct[ing] that all of his property (which presumably include[d] all of the personal property of [C.E.]) be made a part of [the Trust]." Previously, the Trust called for William's personal property to be distributed to plaintiffs. On August 13, 2021, two days before he died, William changed the beneficiary of his individual retirement account (IRA) from plaintiffs to the Trust, thus "completely disinherit[ing]" plaintiffs. On August 19, 2021, plaintiffs attended William's burial. For the first time, they saw C.E.'s grave. William had erected a headstone that read " 'Beloved Wife' " but did not mention C.E. as the plaintiffs' mother. This omission "was intended only to hurt [plaintiffs]."

¶ 22    Plaintiffs alleged in detail that William's treatment of them was intended to, and did, cause them severe emotional distress.

¶ 23                                B. Motion to Dismiss

¶ 24    BMO moved to dismiss count I of the amended complaint as either time-barred (see 735 ILCS 5/2-619(a)(5) (West 2022)) or insufficient to state a cause of action for intentional infliction of emotional distress (see *id.* § 2-615). Specifically, BMO contended that (1) the two-year statute of limitations barred plaintiffs from recovering for most of William's alleged conduct and (2) the remaining conduct was not so extreme or outrageous as to amount to intentional infliction of emotional distress.

¶ 25    On the timeliness issue, BMO contended as follows. Plaintiffs filed their original complaint on August 15, 2023. To settle their disputes without litigation, the parties entered into an agreement

that tolled the limitations period for 47 days. Thus, only wrongful conduct occurring on or after June 29, 2021, or not reasonably discoverable until then, fell within the limitations period. Accordingly, BMO argued that the only conduct that fell within the limitations period was (1) William's August 7, 2021, amendment to the Trust, changing the disposition of his (and, presumably, C.E.'s) personal property; (2) his August 13, 2021, change of IRA beneficiaries; (3) his cruelly phrased rejection of J.E.'s unsolicited help in caring for him near the end of his life; and (4) his deliberate omission of any mention of plaintiffs on C.E.'s headstone. BMO argued that none of these acts, individually or collectively, rose to the level of extreme outrage needed to state a cause of action for intentional infliction of emotional distress. Further, under *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 92 (1976), William was, in all these instances, exercising his legal rights in a permissible way, foreclosing any claim of intentional infliction of emotional distress.

¶ 26     BMO further contended that, even if the acts predating June 29, 2021, supported a cause of action, they were outside the limitations period. BMO recognized that, under the continuing-tort doctrine, the limitations period could be tolled for a tort involving continuous or repeated injury. See *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003) (*Feltmeier II*), *aff'g* 333 Ill. App. 3d 1167 (2002) (*Feltmeier I*). However, BMO argued that the doctrine did not apply here because it required continuing wrongful acts, not merely continuing ill effects from wrongful acts predating the limitations period. See *Feltmeier II*, 207 Ill. 2d at 278. Moreover, BMO maintained that the alleged wrongful acts, at least from 2016 onward, were less extreme than plaintiffs' conclusional characterizations implied.

¶ 27     Plaintiffs responded that the legitimacy of a defendant's interests is only one factor in whether given conduct is intentional infliction of emotional distress; there is no bar to recovery for pursuing legitimate objectives by outrageous means. Also, William's awareness that plaintiffs

were peculiarly susceptible to emotional distress, based on his long-standing abuse of them, made his conduct more outrageous. Moreover, as plaintiffs' father, William exercised significant power over them.

¶ 28   Next, plaintiffs contended that count I alleged "a continuous stream of outrageous indignities and injuries [inflicted] *** over decades." Thus, because of the continuing-tort doctrine, the limitations period had not commenced until the date of the last tortious act.

¶ 29   After hearing arguments, the trial court granted BMO's motion and dismissed count I. The court explained that plaintiffs were now in their forties and that most of the alleged incidents occurred 20 to 30 years before they filed the action. The dates of many incidents were unspecified. The complaint alleged little that happened between 2014 and 2021; thus, it fell short of portraying a continuous, unbroken course of conduct. See *Cunningham v. Huffman*, 154 Ill. 2d 398, 406-07 (1993). The court concluded that the alleged acts preceding June 29, 2021, were too remote to invoke the continuing-tort doctrine.

¶ 30   Moreover, citing *Davis*, 66 Ill. 2d at 92, the trial court reasoned that much of William's conduct, however hurtful to plaintiffs, was the exercise of his legal rights in a lawful manner; the court specified William's repeated refusals to talk to plaintiffs, his decision to disinherit them, and his choice not to mention plaintiffs on C.E.'s headstone.

¶ 31   In its order, the trial court included the appropriate language to make the dismissal of count I immediately appealable. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Plaintiffs timely appealed.

¶ 32                               II. ANALYSIS

¶ 33   On appeal, plaintiffs contend that the trial court erred in holding that the statute of limitations barred any recovery for most of William's alleged acts and that count I failed to state a cause of action for intentional infliction of emotional distress. Plaintiffs argue that the continuing-

tort doctrine applies to all of William's alleged conduct and that the allegations of count I, either in full or as limited to those acts that occurred within the limitations period, state all elements of a cause of action for intentional infliction of emotional distress.

¶ 34    We consider the limitations issue first because it affects our review of the sufficiency of count I. Section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2022)) permits the dismissal of a claim as time-barred. Under section 13-202 of the Code (*id.* § 13-202), an action for personal injury—including the intentional infliction of emotional distress (see *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744 (2001))—must be commenced within two years of when the cause of action accrues. Under the discovery rule, a cause of action for personal injury accrues, and the limitations period begins to run, when the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused. *Clay v. Kuhl*, 189 Ill. 2d 603, 608 (2000). Our review is *de novo*. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55.

¶ 35    The parties agree that the following alleged acts by William are within the time limit: (1) his August 7, 2021, amendment to the Trust, changing the disposition of his (and, presumably, C.E.'s) personal property; (2) his August 13, 2021, change of IRA beneficiaries; (3) his telling J.E. to "get lost," thus refusing her assistance with his end-of-life care; and (4) (based on the discovery rule) his intentionally omitting any mention of plaintiffs on C.E.'s headstone. BMO contends that no other alleged acts are within the statute. Plaintiffs contend that *all* acts alleged were part of a continuing course of tortious conduct and thus fell within the limitations period. The trial court rejected plaintiffs' argument, relying on the essential discontinuity between the acts committed or discoverable within the limitations period and the other earlier acts. To address this issue, we must delve into the case law defining and applying the continuing-tort doctrine.

¶ 36    We turn first to *Feltmeier I* and *II*, on which plaintiffs primarily rely. There, the plaintiff claimed that the defendant, her former husband, committed intentional infliction of emotional distress through persistent mental and physical abuse from the beginning of their marriage in October 1986 until over a year after it was dissolved in December 1997. *Feltmeier I*, 333 Ill. App. 3d at 1170. The plaintiff's complaint was "very specific about the details and time frames of the alleged *** abuse." *Id.* Specifically,

> "[the plaintiff] alleged that she was physically beaten at least 11 times. She claimed that many of the beatings were administered while her children were at hand to witness them. [She] further alleged that she was physically restrained against her will on more than one occasion. In addition to the physical abuse, [she] repeatedly found herself on the receiving end of verbal attacks and flying objects hurled in her direction. She alleged that [the defendant] systematically isolated her from family and friends. Finally, she alleged that when she took action to rid herself of the abuse, [the defendant] stalked her. The complaint specifically alleged more than 45 episodes of abusive behavior." *Id.*

¶ 37    The plaintiff filed her action in August 1999. *Id.* The defendant moved to dismiss the complaint because (1) the allegations did not state a cause of action and (2) most of the alleged abuse took place outside the two-year statute of limitations. *Id.* at 1171. The trial court denied the motion but certified for interlocutory appeal the two issues raised in the motion. *Id.* The appellate court agreed with the trial court on both issues. *Id.* at 1177, 1181. The defendant appealed to the supreme court. *Feltmeier II*, 207 Ill. 2d at 266.

¶ 38    The supreme court affirmed the appellate court, holding that the continuing-tort doctrine applied. *Id.* at 285. At the outset of its analysis, the court "believe[d] it important to note what does *not* constitute a continuing tort." (Emphasis in original.) *Id.* at 278. "A continuing violation or tort

is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Id.* Under the continuing-tort doctrine, the statute of limitations is "held in abeyance until the date of the last injury suffered or when the tortious acts cease." *Id.* at 284. The court agreed with the appellate court that the alleged abuse " 'spanned the entire 11-year marriage' " and exemplified a case of battered-wife syndrome. *Id.* at 283 (quoting *Feltmeier I*, 333 Ill. App. 3d at 1181).

¶ 39    We turn to the authority that *Feltmeier II* cited with approval. In *Cunningham*, in March 1989, the plaintiff sued her physician for malpractice. *Cunningham*, 154 Ill. 2d at 401. The plaintiff alleged the following timeline: 1977 (the defendant inserted an intrauterine device (IUD) into the plaintiff); 1980 (the plaintiff complained of abdominal cramps and other symptoms, and the defendant inserted a second IUD after failing to detect the first one); 1981 (the plaintiff's symptoms continued, and the defendant performed a tubal ligation and removed an IUD, but with no change in the plaintiff's condition); 1983 (the defendant last saw the plaintiff); 1986 (the plaintiff's symptoms continued, and she saw a new physician); and 1988 (the plaintiff went to the emergency room for abdominal pain, and an IUD was ultimately removed from her). *Id.* at 400-01.

¶ 40    The supreme court was asked to decide, as a matter of first impression, "whether the Illinois four-year statute of repose is tolled until the date of last treatment when there is an ongoing patient/physician relationship." *Id.* at 400. The court held:

> "While we reject adoption of the continuous course of treatment doctrine as being beyond the purview of the statute [of repose], we hold, however, given the circumstances such as those in this case, that a plaintiff is not barred by the statute of repose if she can demonstrate that there was an ongoing course of continuous *negligent* medical treatment.

To prevail under this cause of action a plaintiff must demonstrate: (1) that there was a continuous and unbroken course of *negligent* treatment, and (2) that the treatment was so related as to constitute one continuing wrong." (Emphases in original.) *Id.* at 406.

The court concluded that, "when there is a continuous course of negligent treatment, the statute of repose does not begin to run until the last date of that negligent treatment." *Id.* at 409.

¶ 41 In *Pavlik*, on November 1, 1996, the plaintiff sued a counseling firm and its principal, Kornhaber, for, *inter alia*, intentional infliction of emotional distress. *Pavlik*, 326 Ill. App. 3d at 735. The plaintiff alleged that, as a condition of her employment with the firm as a therapist, she "received both professional supervision and counseling from Kornhaber." *Id.* She alleged that, "[d]uring the course of this dual relationship," Kornhaber engaged in frequent acts of sexual harassment, including in-person advances and "14 different memos, letters, and handwritten notes addressed from [Kornhaber] that ma[d]e various sexual suggestions, requests, and demands." *Id.* at 735-36. His harassment began in July 1994; the plaintiff's last counseling session with him was on October 17, 1994; she resigned her position on November 1, 1994; he called her on November 3, 1994; he wrote her a letter on November 4, 1994, expressing dismay over her resignation; and on November 8, 1994, he told her that he was withholding her pay because she had not properly terminated her employment. *Id.* at 736-37. The plaintiff had to pursue administrative action to recover her pay. *Id.* at 737.

¶ 42 The trial court dismissed the counts for intentional infliction of emotional distress as barred by the two-year statute of limitations for personal injury claims. *Id.* In reversing, the appellate court explained that the counts pleaded "a continuing series of tortious [acts]," because the acts were "continuous, by the same actor, and of a similar nature." *Id.* at 745. Thus, the limitations period did not start to run until "the last act occur[ed] or the conduct [was] abated." *Id.* The

defendant contended that, "although the [limitations] period may not run during continuing violations, every occurrence within the continuum must be independently actionable." *Id.* He claimed that the only alleged acts that occurred within two years of the complaint's filing—the November 1994 contacts and the wage dispute—were not sufficiently outrageous to be independently actionable. *Id.* The court disagreed, reasoning that, because "repetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones" (*id.*), "the termination of the conduct provides the most sensible place to begin the running of the [limitations] period" (*id.* at 746). Thus, even if Kornhaber's acts postdating November 1, 1994, were not individually actionable without more, they could have been "a contributing factor to [the plaintiff's] distress"; thus, the limitations period started only when these acts ended. *Id.* at 747.

¶ 43 Here, applying the foregoing authorities to count I of plaintiffs' complaint, we note that all alleged improper acts (before or after June 29, 2021) can be similarly characterized and share a common perpetrator. Thus, the crux of the matter is whether those acts were sufficiently "continuous" under the case law. For clarity, we set out a timeline for each plaintiff outlining the pertinent acts William allegedly committed before June 29, 2021. We note that the pertinent acts committed on or after June 29, 2021, were the same for all plaintiffs, except that only J.E. was directly affected by William's rejection of her assistance with his end-of-life care.

*S.E.*:

> c. 1975: riding on lap (erection)
>
> c. 1981: water spill
>
> c. 1989: kiss on lips
>
> c. 1994-2004: bedroom incidents, one involving his erection
>
> c. 2004-2014: incident in motel bathroom

March 2019: e-mail: "you don't have much time left"

Late 2019: D.C. hotel meeting

Unspecified: taunting and calling her "dumb" (numerous times)

Unspecified: kissing, snuggling while naked

*J.E.*:

c. 1983 (multiple times): physical abuse

c. 1986: beating, hitting, and dragging her; threatening sisters and C.E.

c. 1994: street incident and physically abusive punishment

September 2014: hung up in response to call about miscarriage

2016-2019: four phone calls rejected/taunting

March 2019: e-mail: "you don't have much time left"

Mid-2020: hung up in response to call about C.E.

Late 2019: D.C. hotel meeting

Unspecified: kissing, snuggling while naked

*B.E.*:

c. 1989: pill incident

c. 1992: oral hygiene punishment

c. 1994: bicycle chain incident

c. 1993-mid-2000s:

    Used her as his "personal servant"

    Punishments *re* garbage and sweeping floors: sewage scraping; chemicals and tools; animal torture (multiple incidents for each)

c. 2000s: hose-spraying incident, sabotaging job interviews

Spring 2017: call to Virginia private number

March 2019: e-mail: "you don't have much time left"

Late 2019: D.C. hotel meeting

Unspecified: kissing, snuggling while naked

¶ 44    We note the following about these timelines. First, we agree with the trial court that they show that William engaged in truly extreme and outrageous conduct in the 1970s, 1980s, and 1990s. Second, however, as the court also noted, the same is not true of his conduct after all three children achieved majority and two of them moved out of state. Many of the allegations are vague as to time. In particular, very little of William's conduct is specifically associated with the period between 2004 and 2013, or between 2015 and 2019. Plaintiffs do not contend that William inflicted emotional distress passively, *i.e.*, by merely failing to act. Therefore, we are left with a long gap between each plaintiff's childhood/early youth and her early middle age, when the incidents were few and relatively far between. Also, by this time, plaintiffs no longer directly depended on William for their daily support and did not reside with him.

¶ 45    We cannot say that this case closely resembles *Feltmeier I* and *II* or *Pavlik*, in both of which the allegedly tortious acts were far more numerous, generally linked to specific dates, and undertaken within significantly shorter periods. See *Feltmeier I*, 333 Ill. App. 3d at 1170 (45 abusive incidents in 11 years); *Pavlik*, 326 Ill. App. 3d at 736 (14 written communications, plus phone calls and in-person advances, in five months). In *Cunningham*, a medical malpractice case, the continuity of the defendant's negligence was more obvious and the temporal gaps less serious. Moreover, the failure to correct previous negligent acts was itself a continuous failure. Thus, the plaintiff did not need to rely on affirmative conduct to state a cause of action.

¶ 46    Here, given all the circumstances, we cannot say that any of the tortious acts William allegedly committed before June 29, 2021, are properly before us under the continuing-tort doctrine.

¶ 47    We turn to the second issue on appeal: whether, given our first holding, the complaint states a cause of action for intentional infliction of emotional distress as to one or more of plaintiffs.

¶ 48    We review *de novo* a dismissal of a complaint under section 2-615 of the Code (735 ILCS 5/2-615 (West 2022)). For review purposes, we accept as true all well-pleaded facts in the complaint and any reasonable inferences arising therefrom. *Doe v. Burke Wise Morrissey & Kaveny, LLC*, 2023 IL 129097, ¶ 20. Unless it is clearly apparent that the plaintiff would not be entitled to recovery under any possible set of facts, the complaint should not be dismissed. *Id.*

¶ 49    To state a cause of action for intentional infliction of emotional distress, a plaintiff must plead that (1) the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community, (2) the defendant either intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct did in fact cause severe emotional distress. *Feltmeier II*, 207 Ill. 2d at 268-69; *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988).

¶ 50    There are several factors to consider in judging whether the defendant's conduct was so extreme and outrageous as to exceed all norms of decency. See *McGrath*, 126 Ill. 2d at 86-90. One factor is "whether the defendant reasonably believed that his objective was legitimate." *Id.* at 88. "Although the reasonable belief that his objective is legitimate does not provide a defendant *carte blanche* to pursue that objective by outrageous means [citation], it is a substantial factor in evaluating the outrageousness of his conduct." *Id.* The degree of power or authority that the

defendant has over the plaintiff can affect whether the defendant's conduct is extreme and outrageous. *Id.* at 86. The defendant's abuse of such power or authority is relevant to whether he reasonably believed his objective was legitimate. *Id.* at 88. Further, the defendant's "[k]nowledge that another is peculiarly susceptible to emotional distress may make a person's conduct actionable when it otherwise would not be." *Davis*, 66 Ill. 2d at 94. The defendant "is not liable where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insist[e]nce is certain to cause emotional distress." (Internal quotation marks omitted.) *Id.* at 92.

¶ 51    In holding that all allegations not time-barred nonetheless failed to state a cause of action, the trial court relied on the first element of the tort: extreme and outrageous conduct. Plaintiffs contend that, even disregarding what William allegedly did before June 29, 2021, his remaining conduct alleged in count I met this demanding standard. Plaintiffs argue that the mere fact that William had the legal right to decide to whom to leave his estate and what should be inscribed on C.E.'s headstone did not insulate him from liability, as he made these decisions "for the sole purpose of inflicting emotional distress on the children he actively tormented for decades."[1] Plaintiffs thus emphasize the principles (1) that the legality of a defendant's action does not by itself insulate him from liability for intentional infliction of emotional distress and (2) that the defendant's knowledge of his victims' vulnerability to such distress is a significant consideration in determining whether given conduct is extreme and outrageous.

¶ 52    BMO responds that, in each of the instances in question, William was insulated under *Davis* (see *id.*) because he exercised his unquestioned legal rights in a permissible manner by acting

---

[1]Plaintiffs make no argument about William's spurning J.E.'s assistance with his end-of-life care.

within the law to change his beneficiaries and to decide how his late wife's headstone would read (see 755 ILCS 65/5 (West 2022) (disposition of decedent's remains is prerogative of surviving spouse unless decedent has left directions in writing); *In re Estate of Sperry*, 2017 IL App (3d) 150703, ¶ 6 (statutory right to control disposition of remains includes right to design and place headstone)). BMO contends that *Davis* applies regardless of William's *motivation* for making decisions that were clearly his prerogative under the law.

¶ 53    Whether William's choices were commendable or arbitrary and mean-spirited does not determine whether they amounted to the extreme and outrageous conduct that supports a cause of action for intentional infliction of emotional distress. Again, a defendant "is not liable where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insist[e]nce is certain to cause emotional distress." (Internal quotation marks omitted.) *Davis*, 66 Ill. 2d at 92. Plaintiffs stress William's motives, but those bear strongly on the second element—intent or knowledge—and BMO does not argue that plaintiffs pleaded insufficient facts to establish intent or knowledge.[2] Thus, although plaintiffs did plead that William had an improper objective, that does not cure the deficiency in the pleading of the first element of the tort.

¶ 54    We must grant that, given William's long history of emotional and physical abuse of plaintiffs, his conduct on or after June 29, 2021, might be considered more severe and unthinkable than it otherwise would be. Even granting this much, however, and allowing appropriate reasonable inferences to be drawn, we cannot say that William's post-June 2021 actions met the

---

[2] The third element, actual emotional distress, was sufficiently pleaded, and BMO does not challenge this aspect of count I.

very stringent standards that our courts have imposed for a cause of action for intentional infliction of emotional distress. William's exercise of his legal rights to control his inheritance and determine the text of his wife's headstone, and his concededly mean-spirited rejection of J.E.'s assistance with his care while he was terminally ill, do not rise to the very high level of outrage required by the law.

¶ 55                                III. CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 57    Affirmed.

---

*S.E. v. BMO Harris Bank National Ass'n*, **2025 IL App (2d) 240311**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 23-MR-371; the Hon. Charles W. Smith, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jennifer L. Friedland, of Momkus LLP, of Lisle, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael J. Scotti III and Garry L. Wills, of Roetzel & Andress LPA, of Chicago, for appellee. |